# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 16 2015, 10:00 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Special Assistant to the State Public Defender
Wieneke Law Office, LLC
Plainfield, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David Dickmeyer
Graduate Law Clerk
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of L.P., Mother, and L.H., Child,<br><br>L.P,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | April 16, 2015<br><br>Court of Appeals Case No. 01A02-1402-JT-113<br><br>Appeal from the Adams Circuit Court<br><br>The Honorable Patrick R. Miller, Special Judge<br><br>Cause No. 01C01-1306-JT-2 |

**Kirsch, Judge.**

[1] L.P. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, L.H. ("Child"). She raises the following restated issue on appeal: whether sufficient evidence was presented to support the termination of Mother's parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Child was born on August 5, 2008 to Mother and T.H. ("Father"), who were unmarried, but lived together in Berne, Indiana.[1] On April 16, 2012, Family Case Manager ("FCM") Julie Foster and Berne Police Department Officer Earl Hough ("Officer Hough") conducted an unannounced home visit and assessment at Mother's home. FCM Foster took law enforcement with her on the visit because Mother had made threats against FCM Foster at previous assessments with the family. Mother, Father, and Child were all in the home at the time of the visit. Mother was very upset and belligerent during the assessment. FCM Foster made this visit due to allegations that Mother was making comments about Casey Anthony and had stated that, if Mother was Casey Anthony, she could get away with harming her own child. *Tr.* at 9.

[4] The Department of Child Services ("DCS") discovered through statements by Mother and further research that Mother had two children previously removed

---

[1] T.H. voluntarily relinquished his parental rights.

from her care based on threats that Mother made against their lives. In total, Mother had her parental rights terminated as to three of her children in Kentucky in 2005 and 2008 and as to one other child in Ohio in 2002. DCS had also had two prior assessments with Mother and Child, one when Child was about nine months old, and one when Child was approximately two years old. These prior assessments concerned allegations of Mother's mental health, her lack of treatment for her mental illness, and incidents outside her apartment where Mother was overheard and observed being "belligerent" with Child and making statements "threatening harm to [Child]." *Id*. at 13.

[5] DCS removed Child on April 17, 2012, the day after the initial assessment. When Child was removed, Father was very upset. Mother, however, stayed in bed during the removal and "was very calm." *Id*. at 18. Mother did get out of bed to get clothing for Child and say goodbye, which appeared to FCM Foster as "a forever goodbye." *Id*. On April 19, 2012, DCS filed a Child in Need of Services ("CHINS") petition. Within a few days of removal, DCS spoke to Mother about services and placement for Child. At that time, Mother admitted that she took more of her medications than was prescribed. Therefore, DCS requested that Mother participate in medication management and have an assessment to determine if she was taking the correct medications. DCS also requested Mother complete a psychological evaluation and begin visitations. Mother had services until approximately June 2012 when services were suspended due to Mother's behavior. Before the services were suspended, the

DCS caseworker really had to encourage Mother to participate in services because Mother thought the services were not needed.

[6] In May 2012, Mother had home-based therapy to work on mental health instability and refraining from acting out in hostile or threatening ways. Mother explained that she took more medication than the prescribed amount because it was not effective in the prescribed dosage, and she needed to take more to calm herself down. During this therapy, Mother did not progress toward medication management and mental stability, and instead, she declined. She also "continued to escalate" as to her hostility and "ruminating thoughts." *Id.* at 100.

[7] After Child was removed, DCS referred Mother for home-based services with Janelle Coates ("Coates"), a caseworker with the Youth Service Bureau of Jay County, who was to assist Mother with community resources, transportation, finding housing, and getting prescription assistance and resources for mental health stability. Coates was not able to accomplish any of her goals with Mother. Coates also worked with Mother on supervised visitation with Child. During one of these visits, Mother informed Coates that she did not take her medication, and Mother proceeded to yell at other children to stay away from Child on the playground and hover over Child, extending her arms so that other children would not talk to Child. This visit was terminated early, and when Child started crying, Mother yelled at Child and told her it was Coates's fault they were leaving early and to blame Coates. On another occasion, Coates transported Mother and Father to a psychological evaluation, and after the

evaluation, Mother spent twenty minutes in the bathroom alone and could be heard talking, although it was unclear who she was talking to since she had no minutes on her phone. After storming out of the bathroom, Mother became agitated on the way home and stated that "all social workers are gonna . . . have their heads fucking blown off" and that they "work for the devil." *Id*. at 154. Coates contacted someone from DCS, who called the police. Mother exited the vehicle and stated she was going to walk home, but another driver picked her up.

[8] DCS concluded that it could not ensure the safety of its workers, so due to the volatile nature of the circumstances, on May 24, 2012, visitation and home-based services were indefinitely suspended. After a hearing in July 2012, supervised visitation was to occur at a neutral location, and DCS tried to set up visitation with Mother. Mother only wanted to schedule one visit around the time of Child's birthday and told FCM Foster that it would be the "last time" she would see Child. *Id*. at 34.

[9] A factfinding hearing for the CHINS petition was set for October 31, 2012, but after a meeting prior to the hearing with Mother and Father, attorneys, and DCS, an agreement was reached, in which Mother and Father agreed to admit that Child was a CHINS, and the parties proceeded to a disposition hearing. In the disposition order, Mother was, in pertinent part, ordered to participate in: home-based therapy; home-maker services; supervised visitation twice a month; and medication review and to follow all recommendation of such review. Mother was also ordered to maintain stable and suitable housing. On January

23, 2013, DCS filed a petition to terminate Mother's parental rights. On October 30 and 31, 2013, the juvenile court held an evidentiary hearing on the petition.

[10] During the hearing dates, the following testimony and evidence was presented. After undergoing a psychological evaluation, Mother was diagnosed with posttraumatic stress disorder, chronic; parent-child relational problem; schizophrenia, paranoid type; and paranoid personality disorder. DCS learned that Mother tended to stay up to the early morning hours and did not have a regular sleep pattern, which had affected Child when she was in Mother's care because Mother was keeping Child up and preventing her from functioning as a normal child. At the time of her assessment, Mother reported she had been up for three days and had not showered or bathed in that time, and she stated there was no need to take care of herself because she no longer had Child. Evidence was presented that Mother was not taking her medications and acted very aggressive and hostile toward service providers. When Mother did not take her medications, she talked very fast, spit when she talked, had a white foam around her mouth, spoke incoherently and illogically, and would be argumentative and angry. Other times, Mother took more medications than prescribed, and one time, she called a doctor's office multiple times a day, yelling and wanting more pain medication. Mother recognized that she did not get along well with people and needed to learn to control her anger; however, she felt she was not treated fairly in the community because of her belief she was the "only black person that lives in Adams County." *Id*. at 37.

[11] From October 2012 until May 2013, Mother was provided services, including a home-based caseworker, a home-based homemaker, and home-based therapy services. Initially, after the CHINS disposition hearing, Mother was cooperative with the service providers, and they were able to come to Mother's home for services. However, not long after, Mother would tell the service providers they could come to her home, but that she was "not going to do anything for them," which resulted in little progress toward the DCS goals and work on services. *Id*. at 29. FCM Foster stated that Mother went through the motions, but did not implement the information given to her.

[12] Home-based therapy sessions were ended at a certain point in time due in part to the fact that Mother was receiving services on her own through Park Center. Because of these duplicate services, progress was very slow with the DCS providers because Mother did not feel the DCS services were necessary. FCM Foster attempted to schedule child and family team meetings with Mother, but Mother cancelled two of these meetings and failed to show up for a third. There were also times that Mother would state she was willing to work with the service providers, but when they arrived at her home, she would not answer the door even though the service providers could hear her inside. At the time of the termination hearing, Mother was on her sixth therapist; she also refused to sign anything DCS sent her.

[13] By the time the termination petition was filed, FCM Foster stated that Mother was at the same point she was at when Child was removed. Even though Mother sought her own services, she was not compliant with those service

providers either. According to one of her service providers at Park Center, Mother was, at times, very upset, yelling, cussing, and screaming for no reason, and Mother felt she did not need to work on anger management skills. Mother had switched to Park Center from Meridian Services because her therapist there told her she was mentally ill and would be better treated in a mental hospital. This upset Mother because she thought there was "nothing wrong with her." *Id*. at 33. Because of Mother's lack of improvement and history, among other issues with Child, DCS requested an order for no reasonable efforts, which is an order stating that DCS no longer had to work with Mother toward reunification.

[14] From July 2012 until May 2013, Mother had visitation with Child twice per month at a neutral location. The visitations were very stressful to Child, and she had a lot of anxiety before and after the visits. Specifically: (1) Child did not want to attend the visits; (2) afterwards, Child would ask DCS why they made her visit with her "mean mommy," *id.* at 39; (3) Child consistently stated she did not want to visit with Mother; (4) Child was not able to identify anything positive with Mother, only negative interactions and events; and (5) Child stated she did not want to visit with Mother because of things that happened before she was removed. At one visitation, Mother told Child that if she could not have Child back, she was going to send Child to California to live with a relative, which statement has a negative effect on Child.

[15] Before and after visits, foster mother observed a lot of regression from Child, including reverting back to asking for a bottle. Child would put food in her

pocket because she was afraid she would not have more, and Child would not sleep the night before visitations and acted out more. Foster mother had to reassure Child that she would be reunited with foster parents after the visits, which was a big concern of Child. It usually took a few day for Child to stop being anxious after visitations with Mother, but it would sometimes take up to two weeks. At a certain point in time, DCS implemented home-based therapy for Child work on coping skills and work through Child's anxiety. Child began to have nightmares and night terrors, involving her biological parents. In February 2013, DCS recommended that visitation end between Child and Mother. At the time of the termination hearing, Child was still in therapy, but had made significant progress.

[16] At the time Child was removed, she was three years old, but was not potty trained, spoke a lot of baby talk, still used a sippy cup, was more like a toddler than a preschooler in development, had no sleep pattern and would stay up all night, and was hesitant toward affection. Child was placed in foster care and remained in the same home since removal. After a short time in foster care, Child was potty trained, adjusted to a normal sleep pattern, and began talking and communicating with foster parents. Child was five years old at the time of the termination hearing and was very bright, participated in ice skating, tested above her grade level, and was very friendly and able to make friends easily. The plan for Child was adoption by foster parents. On January 10, 2014, the juvenile court issued its findings, conclusions, and judgment terminating Mother's parental rights. Mother now appeals.

## Discussion and Decision

[17] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[18] Here, in terminating Mother's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[19] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[20] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).

Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[21] Mother argues that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, Mother contends that DCS failed to present sufficient evidence that the conditions that resulted in Child being removed would not be remedied. She asserts that no evidence was presented that she could not need Child's basic needs, that there were any concerns with the condition of her home, or to support her inability to complete services because she actively participated in services and even sought out her own services. Mother also claims that, as to her mental health, she had made significant improvement with developing interpersonal relationship skills and her anger management. Mother further alleges that DCS failed to present sufficient evidence that termination is in the best interest of Child. She argues that, although Child exhibited anxiety about visits with Mother, there was no evidence that this was due to Mother and not to the condition under which the visitations occurred.

[22] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will

not be remedied.'" *Id.* (citing *In re I.A.,* 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.,* 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[23] Here, the evidence showed that Child was removed from Mother's home on the basis of allegations of Mother making threatening statement about harming Child and due to Mother's mental health issues. Mother had two other children removed from her care due to threats made against their lives, and her parental rights had previously been terminated to three of her children. In the prior cases from other states, the cases noted that Mother's mental health issues indicated an increased risk of harming the children. Additionally, in prior DCS involvement in Adams County, Mother was overheard threatening harm to Child. These circumstances did not change over several years and several different cases.

[24] In the present case, Mother's mental health and medication issues were consistent problems in the underlying case. When Mother had her initial psychological evaluation, she admitted to taking more than her prescribed dosage of her medications. Even after being referred to medication management, Mother continued to have problems taking her medication properly, at times, not taking it at all and other times, taking more than prescribed. Mother's behavior also caused concern throughout the case. At times, she was cooperative, but detached, and other times, she was combative and hostile. At the initial assessment, FCM Foster had the police escort her due to prior threats by Mother that she would harm DCS caseworkers if they returned. Mother often treated the service providers with hostility and would threaten them, which caused DCS to temporarily suspend services for Mother.

[25] Throughout the case, Mother did not realistically address her mental health issues. After being psychologically evaluated, Mother was diagnosed with posttraumatic stress disorder, chronic; parent-child relational problem; schizophrenia, paranoid type; and paranoid personality disorder. However, she denied being schizophrenic and insisted that nothing was wrong with her. For the most part, throughout the underlying case, Mother failed to acknowledge the need to change and, therefore, did not demonstrate any change toward medication management and mental stability.

[26] The evidence clearly showed that Mother did not make any progress with the service providers. She consistently told them they could come to her house, but that she would not do anything for them. She just went through the motions

and did not implement any of the instruction given to her. Mother was uncooperative, did not show the ability to apply what she learned, and did not benefit from the services provided to her. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of Child outside Mother's home would not be remedied.

[27] Mother next argues that insufficient evidence was presented to prove that termination is in the best interest of Child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[28] In the present case, the evidence presented showed that Child experienced severe anxiety both before and after visitations with Mother. Child did not want to go to the visits, and after the visits, she would ask DCS why she was made to visit with her "mean mommy." *Tr.* at 39. Child consistently stated she did not want to visit with Mother, was unable to identify anything positive about her biological parents, could remember only negative interactions and events, and did not want to visit with Mother due to things that happened prior to removal. Child would exhibit a lot of regression after visits with Mother and would not sleep the night before visitations. It would generally take several days for Child to settle down after a visit. However, when the visitations were stopped, Child's behavior improved. Based on the above, we conclude that sufficient evidence was presented to prove that termination was in the best interest of Child.

[29] We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. Further, Mother's arguments are merely a request for us to reweigh the evidence and judge the credibility of the witnesses, which we cannot do on appeal. *In re D.D.*, 804 N.E.2d at 265. We therefore affirm the juvenile court's judgment.

[30] Affirmed.

Friedlander, J., and Crone, J., concur.